Miller, J.
 

 .Whatever confusion of thought may be caused by the obscurity in which the questions of fact and law in this case have been involved, the practical result
 
 *135
 
 thus far reached stands out prominently. The estate of the incompetent has been deprived of $10,897.11 and interest thereon for several years, to the personal enrichment of the committee and his co-remaindermen. It is necessary to bring the facts plainly into view in order to understand precisely how that result has been accomplished and whether it is beyond remedy.
 

 James M. Anderson, who died in 1885, was survived by his wife and three children, the respondent, James M., the incompetent, Eugene, and a daughter, Lizzie, after-wards Mrs. Benedict. For convenience and brevity the material provisions of his will may he summarized according to their legal effect with regard solely to what actually transpired. He devised his real estate in the city of Hew York, and the rents, issues and profits thereof, to trustees, to hold and dispose of the same as follows:
 

 1, to pay his widow from the income and rents sufficient to make her income from the estate $15,000 a year;
 

 2, to pay, if necessary, enough therefrom to Eugene to make up any deficiency in the sum of $2,000 to he paid him annually under an earlier provision of the will;
 

 3, to divide the residue thereof into three parts, to pay one to James M., one to Lizzie or her issue, and to accumulate the other in accordance with the earlier provisions for Eugene hereinafter stated.
 

 Upon the death of the widow he directed a division of said real estate.into three shares, one tobe transferred to James M., one to he held on the further trust to accumulate the. income during the life of Eugene as aforesaid, remainder to his heirs, and one to be held on the further trust to pay the income to Lizzie during her life, remainder to her issue.
 

 He devised and bequeathed his residuary estate to trustees to pay the income on one-fourth to his widow during her life, to pay one-fourth absolutely to James M., to hold one-fourth during the life of Eugene, and to pay $2,000
 
 *136
 
 of the income thereon to him annually and accumulate the balance, and upon his death to pay said share and its accumulations to his next of kin, and to pay the income on the other one-fourth share to Lizzie during her life, with remainder to her issue. The widow was given power of appointment with respect to the oherfourth held for her benefit, and, failing the exercise of that power, that was to be divided into three shares and disposed of in like manner as the other three-fourths as aforesaid. The trustees were empowered in their discretion to sell and convey the real estate, and were directed to keep the personal estate and the proceeds of any real estate sold by them invested “during the continuance of the trust in interest bearing State, United States, or New York City bonds or stocks, or loaned out upon bond or mortgage. ”
 

 Among other parcels of New York real estate, the testator owned three lots, Nos. 1180, 1182 and 1184 Broadway. He had given a lease of 1180 in 1863 to one Newman to run for twenty years from February 1st, 1864; he to have the option to renew it upon its expiration or to pay the valuation then found on the buildings. At its expiration it was renewed for the further term of twenty years to expire February 1st, 1904, the tenant to have the privilege of renewing it for a further term of twenty years at a ground rental to be five per cent of the then valuation of the lot, exclusive of improvements, and at the expiration of such renewal lease, the landlord was to pay the value of the buildings or improvements then on the lot. From 1881 to her death in 1896 the widow was the sole trustee. Upon her death the respondent became, and still is, sole trustee under the will of his father. In 1888 Eugene was judicially declared incompetent, and his brother, the respondent, was appointed committee of his person. In 1896 the respondent was appointed committee of Eugene’s estate and he is now accounting as such committee. Lizzie died after the death of her mother and prior to 1903, leaving two children. The
 
 *137
 
 income of the share held for Eugene was largely in excess of the $2,000 paid him annually, and, pursuant to the terms of the will, but manifestly in contravention of the statute, the excess was accumulated by the trustee. On the 29th of August, 1894, she purchased the outstanding lease of 1180 Broadway and a mortgage "thereon, which had been made by said Newman, and took assignments both of the lease and mortgage to herself as trustee of James M. Anderson, deceased, paying therefor $32,691.31 of the moneys thus unlawfully accumulated.
 

 In 1903 the infant children of Mrs. Benedict brought a suit in the Supreme Court for a construction of said will, and it was adjudged that the provisions for the accumulation of income were invalid, and that as to such income the testator died intestate. Pursuant to the interlocutory judgment in that case, the respondent accounted as trustee. In that accounting he credited the accumulated fund with the interest on said sum of $32,691.31 at four per cent up to July 31st, 1903, describing the credit as “interest on investment in premises No. 1180 Broadway.” He charged that interest to the income of the trust estate and he accounted for the total rents received from 1180' Broadway as part of said income. The final judgment in that action adjudged that the respondent as trustee held in securities and cash the sum of $167,105.31, surplus rents, issues and income, and that that sum was invested and held by him in the manner specified, among other things in “investment in 1180 Broadway, $32,691.31.” It also adjudged that Eugene was entitled to an equal one-third part of the sum of $167,105.31 and directed the trustee after the payment of his commissions, costs and expenses, to “pay to said Eugene Anderson an equal one-third of the remainder.” According to the recitals in the judgment, Eugene was not represented in that action except by his committee, the accounting trustee, though there is a stipulation that all persons interested were before the court either as plaintiffs or
 
 *138
 
 defendants. The respondent paid himself a commission on the entire surplus' fund, including said sum of $32,691.31, and on the 8th day of December, 1903, within two months of the expiration of said lease, he as trustee, “in partial payment of the sum directed by the said judgment to be paid to James M. Anderson as committee of the estate of Eugene Anderson, ” assigned to himself as such committee “ an equal one-third part or share of the item of property described as investment in 1180 Broadway,” and as committee he receipted for that as and for the sum of $10,897.11. On September 19th, 1905, the premises No. 1180 Broadway, together with 1182 and 1184, were sold for $425,000 and a mortgage on No. 1180 for $120,000 was taken back, $40,000 thereof running to the children of Mrs.'Benedict, $40,000 to the respondent individually and $40,000 to him as trustee. That mortgage was paid in 1908, but nothing was credited to Eugene or transferred to the respondent as his committee, though, so far as appears, the respondent as trustee still holds the $40,000 paid him as such trustee. The referee in this case found:
 

 “In the year 1894, Harriet E. Anderson,-the widow of said testator, was the sole trustee under the said will and codicil, and she, as such trustee, purchased of the executors of said Allen G-. Newman, for the estate, the above mentioned lease of No. 1180 Broadway, which then had between nine and ten years to run. * * * The purchase of the lease was made by Mrs. Anderson for the benefit of the estate, and thereafter the annual income derived from the said premises No. 1180 Broadway was largely in excess of the rental of $2,000 reserved in the said lease.”
 

 Eugene died March 1st, 1912, leaving a will in which his wife was named sole executrix and legatee. He left no issue, and the respondent and the children of Mrs. Benedict are his sole heirs and next of kin. The Special Term surcharged the account of the committee with the
 
 *139
 
 sum of $10,897.11, with interest at four per cent from the 31st of July, 1903. An appeal was taken from that part of the order which in so far as appealed from was reversed by the Appellate Division.
 

 In 1894, when the outstanding lease was purchased, the trustee held the title to the New York real estate and a large surplus of income accumulated pursuant to the provisions of the will. If those provisions had been valid, the beneficial interests in the accumulated fund and the trust estate would in fact have been the same, except for the possibility, evidently considered remote, of Eugene’s leaving issue. Deeming it of advantage to the trust estate and doubtless thinking, at least so we may assume, that the surplus fund and the trust property would ultimately be divided among the same persons, she bought in an outstanding. leasehold estate, using a part of the surplus fund for the purpose. The referee- found that she did that for the benefit of the estate. Even conceding that that finding is ambiguous, it should be construed to mean what the circumstances indubitably show, namely, that she purchased for the benefit of the trust estate and not as an investment for a surplus fund. The purchase was in fact so treated by the trustee, who thereafter credited all the rents, which the referee found were largely in excess of the rent reserved in the lease, to the income of the trust estate. If the lease had been bought as an investment for the surplus fund, it should have received all of the rents in excess of the rent reserved, but it in fact received but four per cent interest for the money used in the purchase; The trust estate profited not only by the increased rentals received, but by the extinguishment of the tenant’s right to renew and of its obligation to pay for the buildings on the - expiration of the renewal lease, and by being enabled to effect a sale of 1180, together with 1182 and 1184 Broadway, which it may be assumed could not have been made as advantageously without obtaining a surrender of the lease of
 
 *140
 
 1180. The respondent and the children of Mrs. Benedict have received those benefits. If-the order appealed from be permitted to stand, the surplus fund will have lost $32,691.31 of principal on which it received four per cent interest for a few years. That unjust result has been reached on the theory that the lease was purchased as an investment for the surplus fund and that the respondent could only be charged with liability for a failure to renew; the lease, from which he is absolved by the fact that at its expiration it was owned one-third by himself individually, one-third by him as committee and one-third by infants who could not consent to a renewal. We at once look for the error in the reasoning which leads to such a conclusion.
 

 In the first place, the argument is based on a premise which is false in fact and contrary to the finding of the referee. But assume for the moment that the trustee did purchase the lease as an investment for the surplus fund, her act was wrongful for at least three distinct reasons, viz., 1, as matter of law she had no right to invest the fund at all; her sole duty was to pay it over; 2, the investment, if it be treated as such, in a leasehold estate was improvident and wrongful; that requires no argument; 3, it was contrary to the express directions of the testator. The trustee was, therefore, personally accountable for the wrongful use of the fund, and of course in equity her trust estate was chargeable to the extent that it benefited. The respondent succeeded his mother as trustee in 1896, and also became committee of the property of the incompetent. It was then his duty as trustee to pay over to himself as committee the incompetent’s money which had wrongfully accumulated in the hands of his predecessor, and it was also his duty to adjust the equities between the surplus fund and the trust estate, growing out of the improper use of the moneys belonging to the.surplus fund and, if necessary, to look to the estate of the mother to make good any loss.
 
 *141
 
 For neglect of that duty he can he held personally liable. (See
 
 Bennett
 
 v.
 
 Pierce,
 
 188 Mass. 186.) As trustee he continued to accumulate the surplus income, He was directed by the judgment of 1903 to pay over to himself as committee of the estate of Eugene an equal one-third part of the remainder of the sum of $167,105.31, after deducting costs, expenses and commissions. Ostensibly in pursuance of that direction, he as committee accepted from himself as trustee an assignment of a one-third interest in what he called “item of property described as
 
 '
 
 investment in 1180 Broadway,’ ” and receipted for it as and for the sum of $10,897.11. If that item of property meant the lease, it could have been more easily and plainly described. But assume for the moment that it did mean the lease. The respondent then as committee accepted from himself as trustee an interest in an improvident and wrongful investment as of the value stated, although it had become worthless. Even then the equities between the surplus fund and the trust estate could have been adjusted, and the acceptance of a worthless security as and for a definite sum of money should render him accountable to his incompetent for that sum. (See
 
 Brigham
 
 v.
 
 Morgan,
 
 185 Mass. 27.)
 

 While it is not' decisive of the case it is pertinent to inquire whether the leasehold estate did not in fact merge in the greater estate when both titles were united in the trustee. Her intention to effect a merger is necessarily implied in the finding that she purchased for the benefit of the estate which, as I have said, should he construed to mean the trust estate, not the fund which was being accumulated in violation of law and which she had no right to invest but held at most on a passive trust. As I have already shown, the trustee subsequently treated the leasehold as merged in the fee, and the greater estate received all of the benefits of a merger. To he sure, the trustee took an assignment, not a surrender, of the lease. She also took an assignment, not a satisfaction, of the
 
 *142
 
 mortgage on the leasehold estate, though the mortgage incontestably merged in the greater estate. But it is said that the beneficial interests in the surplus fund and in the trust estate were not the same, Eugene being entitled absolutely to one-third of the one and to only one-ninth of the income of the other. That again begs the question and assumes that the lease was bought as an investment for the surplus fund. Of course, in that case, there was no merger. We must distinguish for the moment between the wrongful use by the trustee of the money and her purchase "of the lease for the benefit of the trust estate. Having, with that intention,. effected a union of the titles in herself, a merger resulted in equity as well as at law unless justice prevents it.
 
 (Asche
 
 v.
 
 Asche,
 
 113 N. Y. 232;
 
 Smith
 
 v.
 
 Roberts,
 
 91 N. Y. 470, and cases cited on page 475 of the opinion.) Doubtless, equity, if necessary to protect the surplus fund, would prevent a merger, but justice certainly does not require that the two estates be kept distinct in order that, after the lease has expired, it may be assigned to satisfy a claim for the wrongful use of the money with which it was purchased. As the trust estate received all the benefits of a merger, as the respondent treated the two estates as having merged until as trusted he undertook to settle with himself as committee, and as it is now too late to protect the surplus fund by resort to the lease, justice would seem to require that the rights and obligations of the parties be determined by accepting the situation which the respondent himself not only neglected to remedy but has actually helped to create.
 

 The question is not
 
 res adjudicata.
 
 The purpose of the action brought by the children of Mrs. Benedict was primarily to procure an adjudication that the provisions of the will for an accumulation of income during the life of Eugene were invalid. That having been adjudged, the trustee was called upon to account to determine the amount of the unlawful accumulation in his hands. That
 
 *143
 
 amount was determined to be $167,105.31, and he was ordered to pay over one-third of that sum less costs, etc., to himself as committee of Eugene. He did not ask and it was not adjudged that he divide and transfer the property in his hands in kind. He did not ask to be relieved of paying any part of the sum found to have been accumulated on the theory that any of it had been lost by the improvident and wrongful investment made by his predecessor. He accounted for the property in his hands as of the value of $167,105.31. The judgment did state how that fund was invested and held by him, and that $32,691.31 was held in “ investment in 1180 Broadway.” That language must be construed with reference to the account of the trustee, which credited the surplus fund with four per cent interest “on investment in premises Ho. 1180 Broadway,” and the income of the trust estate with all the rentals received from 1180 Broadway. That investment,, then, must have been adjudged to be a lien, but how it was created or of what it consisted was not disclosed, and no issue was raised respecting it. The estoppel of the judgment extends at most to the matters which “are comprehended and involved in the thing expressly stated and decided.” (Thorn v.
 
 De Breteuil,
 
 179 N. Y. 64, 82.) It was not stated or decided that $32,691.31 had been invested in a lease which then had but a few months to run. The propriety of such an investment was, therefore, not comprehended in the thing expressly decided and is not
 
 res adjudicata. (Rudd
 
 v.
 
 Cornell,
 
 171 N. Y. 114, and cases cited on page 130.) The respondent, then, as committee, cannot absolve himself from responsibility for accepting from himself as trustee an assignment of a one-third interest in a lease about to expire on the theory that the original investment by his predecessor had been adjudged proper and lawful. But even the assignment did not purport to be an assignment of a one-third interest in a lease, and, if the judgment operates as an estoppel at all with respect to the matters now in controversy, it estops
 
 *144
 
 the respondent and the plaintiffs in that suit, the children of Mrs. Benedict, to deny that there was a valid lien on the premises No. 1180 Broadway amounting to $32,691.31 to the credit of the surplus fund. It was the respondent’s duty when he sold the premises to satisfy that lien.
 

 If we lay technical rules and matters of form to one side for the moment and consider the substance of the transaction only, it would seem that the respondent’s duty to make good the moneys of his incompetent brother rested upon the plainest grounds of justice and equity. The mother had no right to invest the moneys of the incompetent at all, much less in a leasehold. We will assume that she had no right to. mortgage or incumber the trust property. She did in fact wrongfully use the incompetent’s money to remove what was virtually. an incumbrance, to add to her greater estate an outstanding leasehold estate. Doubtless that was done in good faith, on the assumption that the surplus fund would ultimately be distributed precisely as the trust estate was to be divided on the termination of the trust. A mistake of law was made. The trust estate received all of the benefits of it and the incompetent lost $10,891.11. While the trustee’s duty was to pay over, not to invest, the surplus income, she did,, as incident to her ownership of the fee and her power of management, have the right to improve the trust property and estate, though possibly she could not mortgage it for the purpose without leave of the court. (See Beal Property Law, section 105.) If possessed of sufficient available funds or if authorized by the court to mortgage for the purpose, she probably had the right, though it is not necessary to decide the point, to buy in an outstanding lease for the benefit of her estate. (See
 
 Warren
 
 v.
 
 Pazolt,
 
 203 Mass. 328.) The will expressly empowered her to sell but not to mortgage. If upon executing the power of sale, she had found it advantageous, especially in view of her ownership of the
 
 *145
 
 adjoining lots, to obtain a cancellation of the lease, she certainly would have had the power to do that by providing for payment out of the proceeds of the sale. Now, she did in fact buy in the outstanding lease, wrongfully using the incompetent’s money in part for the purpose. Of course in equity the leasehold estate would háve been keep distinct from the greater estate for the purpose of protecting the money invested in it. The lease was valuable mainly because of the privilege of renewal and the obligation of the landlord to pay for the buildings at the end of the renewed term. The situation was so complicated by the trustee that that value was lost and it is now too late to reach it. But, while that value was lost to those whose money went into it, it was added to the trust estate. That may not have created a lien, unless the trustee was authorized to create one; but it did create equities requiring adjustment to the extent at least that the trust estate was benefited. As the result of the transaction, the estate received an increased income, and in 1905 the respondent individually and as trustee and the children of Mrs. Benedict were enabled to sell 1180 Broadway together with 1182 and 1184, free from the lease of 1180 and the obligation to pay for the buildings on it at the expiration of the lease. Then at least the equities between the surplus fund and the trust estate should have been adjusted. The judgment of 1903 recognized an interest of the surplus fund in 1180 Broadway, even if it did not adjudge that that interest was a lien. So far from operating as an estoppel against the incompetent, it at least established that he had some undefined interest, legal or equitable, which was assumed to be worth $10,897.11. Taking the most favorable view to the appellant, we will assume that that interest was merely an equitable claim to be reimbursed to the extent only that the greater estate had benefited by the purchase of the leasehold estate. The respondent, when as trustee he assigned that interest to himself as committee,
 
 *146
 
 recognized, as the description used by him shows, that it was something different "from a one-third interest in a lease. It was his duty then both as trustee and as committee, when he sold the premises, to have that interest determined and provided for out of thé proceeds of the sale. There can be no doubt of the power of a court of equity, if properly invoked, to adjust the equities between the surplus fund and the trust estate growing out of the purchase of the lease.
 
 (Stevens
 
 v.
 
 Melcher,
 
 152 N. Y. 551.) Instead of invoking that power, the respondent pocketed one-third of the proceeds, turned another third over to his sister’s children, and either has divided or still retains, as trustee, the other third, from which he may still be reimbursed for the amount with which his account as committee was surcharged by the Special Term. If he claimed that the trust estate was not benefited to the full extent of the money employed for the purpose, it was for him to show it.
 

 The order of the Appellate Division should be reversed and the order of the Special Term affirmed, with costs.